J-S11029-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| IN THE INTEREST OF: K.T.J., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| APPEAL OF: V.S., MOTHER | No. 1228 EDA 2015 |

Appeal from the Order Entered April 21, 2015
In the Court of Common Pleas of Philadelphia County
Family Court at No(s): CP-51-AP-0000129-2015
CP-51-DP-0001573-2013

BEFORE:  FORD ELLIOTT, P.J.E., OTT, J., and MUSMANNO, J.

MEMORANDUM BY OTT, J.:                         **FILED FEBRUARY 18, 2016**

V.S. ("Mother") appeals from the decree entered on April 21, 2015, in the Court of Common Pleas of Philadelphia County, that involuntarily terminated her parental rights to her son, K.T.J., born in December of 2003 ("Child").[1, 2]  Upon careful review, we affirm.

---

[1] By separate decree entered on the same date, the parental rights of Child's father, B.J. ("Father"), were involuntarily terminated.  Father did not file a notice of appeal, and he is not a party to this appeal.

[2] This appeal was delayed for listing before this Court due to the untimely receipt of the certified record from the Philadelphia County Court of Common Pleas.  This Court has acted diligently in attempting to facilitate the prompt processing of this appeal.

The trial court accurately stated, "Mother has an extensive history with [the Philadelphia County Department of Human Services ("DHS")] having 15 children who were in either placement or have been adopted." Trial Court Opinion, 7/21/15, at 1. Instantly, on July 23, 2013, when Child was nine years old, he was placed in the custody of DHS due to a report alleging that he had not attended school since 2011. Trial Court Opinion, 7/21/15, at 1. Further, the report alleged that Mother had a history of drug abuse, lacked parental skills, and was unable to keep Child safe. *Id.* On August 7, 2013, the trial court adjudicated Child dependent. *Id.* at 2.

DHS established the following Family Service Plan ("FSP") objectives for Mother, in relevant part: participate in visitation with Child; participate in parenting classes; and obtain appropriate housing. N.T., 4/21/15, at 7-8; Trial Court Opinion, 7/21/15, at 2, 4. In addition, Mother was ordered to attend all of Child's medical appointments; to contact the Clinical Evaluation Unit ("CEU") regarding forthwith drug screens and evaluation; and to comply with any recommendations of the CEU. Trial Court Opinion, 7/21/15, at 2, 4.

Child was placed in a therapeutic foster home, where he has resided since his removal from Mother's custody. N.T., 4/21/15, at 5. 35. Child receives mental health therapy and is prescribed medication due to behavioral problems. *Id.* at 36, 68.

On March 4, 2015, DHS filed a petition for the involuntary termination of Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). On March 9, 2015, DHS filed a petition for a goal change to adoption. A hearing on the termination and goal change petitions occurred on April 21, 2015, during which DHS presented the testimony of its caseworkers, Alisa Branch and Amy Flite, and Dwayne Davis, the clinical case manager for treatment foster care at Devereux Foster Care Services. Mother testified on her own behalf.

By decree dated and entered on April 21, 2015, the trial court terminated Mother's parental rights. In addition, by an order entered on that same date, the trial court changed Child's permanency goal to adoption.[3] Mother timely filed notices of appeal and concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). The trial court issued a Rule 1925(a) on July 21, 2015.

On appeal, Mother presents the following issues for our review:

1. Did [DHS] sustain the burden that Mother's rights should be terminated when there was evidence that [M]other had completed almost all of her permanency goals?

---

[3] Further, at the conclusion of the hearing, on the record and in open court, the trial court granted DHS's motion for finding of aggravating circumstances filed in May of 2014, on the basis of Mother's failure to maintain contact with Child and the involuntary termination of her parental rights to three of her natural children. *See* N.T., 4/21/15, at 97-102; *see also* 42 Pa.C.S.A. § 6302.

2. Was there . . . sufficient evidence presented to establish that it was in the best interest of [C]hild to terminate [M]other's parental rights?

Mother's brief at 4.[4]

We consider Mother's issue mindful of our well-settled standard of review.

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, which requires a bifurcated analysis.

---

[4] In her brief, Mother fails to include an issue with respect to the goal change order. Thus, we conclude that Mother has waived this issue. *See* *Krebs v. United Refining Company of Pennsylvania*, 893 A.2d 776, 797 (Pa. Super. 2006) (stating that any issue not set forth in or suggested by an appellate brief's Statement of Questions Involved is deemed waived).

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). The burden is upon the petitioner to prove by clear and convincing evidence that the asserted statutory grounds for seeking the termination of parental rights are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009).

This Court need only agree with any one subsection of Section 2511(a), along with Section 2511(b), in order to affirm the termination of parental rights. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). We conclude that the trial court in this case properly terminated Mother's parental rights pursuant to Section 2511(a)(1) and (b), which provide as follows:

**(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

- 5 -

. . .

**(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (b).

To meet the requirements of Section 2511(a)(1), "the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties." *In re Z.S.W.*, 946 A.2d 726, 730 (Pa. Super. 2008) (citing *In re Adoption of R.J.S.*, 901 A.2d 502, 510 (Pa. Super. 2006)). The court must then consider "the parent's explanation for his or her conduct" and "the post-abandonment contact between parent and child" before moving on to analyze Section 2511(b). *Id.* (quoting *In re Adoption of Charles E.D.M.*, 708 A.2d 88, 92 (Pa. 1998)).

This Court has explained that a parent does not perform his or her parental duties by displaying a "merely passive interest in the development of the child." *In re B.,N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004) (quoting *In re C.M.S.*, 832 A.2d 457, 462 (Pa. Super. 2003)). Rather, "[p]arental duty requires that the

- 6 -

parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances." *Id.* (citation omitted).

With respect to Section 2511(b), this Court has explained the requisite analysis as follows:

> Subsection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. *Id.* However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008). Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. *Id.* at 63.

*In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010).

In her first issue, Mother argues that the trial court abused its discretion in terminating her parental rights because she was "close to achieving all of" her FSP goals. Mother's brief at 14. Specifically, Mother asserts that she had been visiting Child and spoke to him on the telephone "constantly." *Id.* at 13. Further, Mother asserts that she has been addressing her drug problems by attending a drug and alcohol program. Finally, Mother asserts that her home is appropriate for Child. We disagree.

With respect to her FSP goal regarding visitation with Child, Mother testified that she "probably missed 30" out of 75 visits with Child for the

following reasons: "some of them . . . I was ill, then I just lost my mother, and I was grieving. . . ." N.T., 4/21/15, at 83. Mother testified that she calls Child on the telephone "a lot," and that the foster parents place calls to Mother for Child to speak to her. *Id.* at 79-80. Dwayne Davis, the case manager for the foster care agency, testified on cross-examination that Child's foster parents allow Child to speak to Mother on the telephone, and that it is Mother who calls Child. *Id.* at 45-46, 51. Although he did not know how many times Mother has called Child on the telephone, Mr. Davis testified that it is infrequently. *Id.* at 51.

Indeed, the testimony of Mr. Davis supports the following findings of the trial court regarding Mother's compliance with her visitation objective:

> As to Mother's visitations [with Child], she has not been compliant or consistent with her attendance. The record established that Mother was offered [75] visits throughout the life of the case. Mother was aware of the visits offered and her Child awaited and requested for her to visit. Nonetheless, Mother only attended fourteen visits out of [75] throughout the life of the case. . . . From September 2014 to April, 2015, Mother only attended two visits that lasted two hours each. . . . Mother admitted her lack of attendance. She estimated missing approximately 30 out of 75 visits. Mother was aware of her visits schedule. She received visitation notices at home. For the visits missed, Mother would sometimes no call and no show and at other times confirmed but would cancel.

*Id.* at 5 (citations to record omitted).

Regarding Mother's objective to attend Child's medical appointments, the testimony of the DHS caseworker, Alisa Branch, supports the following findings of trial court:

The record also established that [] Child requires mental health therapy and medication. Both are very important to regulate Child's behavior and emotions. However, Mother refused to consent to Child's treatment and a hearing took place to authorize Child to receive medicine on June 19, 2014. With the purpose to participate in Child's mental health therapy at Green Tree, the trial court ordered Mother to contact the agency, find out her Child['s] appointment dates, and participate in [] Child's mental health therapy. However, Mother failed to participate in Child's therapy sessions.

Trial Court Opinion, 7/21/15, at 6 (citations to record omitted).

Likewise, the testimony of Ms. Branch supports the trial court's findings regarding Mother's failure to comply with the court orders involving illegal drugs, as follows:

At different hearings, the trial court ordered Mother to attend the CEU for drug screens and dual diagnosis, as established by the orders issued at the adjudicatory hearing[] on August 7, 2013, the Permanency Review orders on November 14, 2013, February[] 11, 2014, January 22, 2015, and March 19, 2015.[5] However, Mother ignored the court orders. On a certain occasion, Mother did not avail herself to the CEU on the day ordered by the trial court. Instead, Mother would present herself at a later date claiming that she was ready for a drug screen, but CEU staff refused to give her the test. The record revealed that Mother has been attending regularly a Methadone maintenance program since April 26, 2013. Despite Mother's attendance at the program, Mother tested positive for two additional substances in addition to Methadone on May 29, 2014: Benzodiazepines and Marijuana. Mother lacked a medical prescription to justify the use of both substances.

Trial Court Opinion, 7/21/15, at 5 (citations to record omitted).

_____

[5] The Honorable Joseph Fernandes presided over both the dependency and termination matters.

Further, the trial court found with respect to Mother's parenting objective, "the record established [] she was referred to ARC [the Achieving Reunification Center]. Despite being explained the importance of improving her parenting skills, Mother has not verified her compliance by providing DHS with the pertinent document." Trial Court Opinion, 7/21/15, at 6 (citations to record omitted). Ms. Branch's testimony supports the court's finding in this regard.

Finally, regarding Mother's housing objective, the trial court found, as follows:

> As to Mother's appropriate housing, the record established that in the summer of 2014 Mother was compliant with her FSP objective. However, on April 11, 2015, despite knowing the importance of a new assessment, Mother refused DHS access to her house. Additionally, it was established that . . . [F]ather still lives at Mother's home, despite the fact that [F]ather's FSP requires him to move out of the house. Father moving out of Mother's house is a condition for reunification; therefore, Mother's housing objective is incomplete.

Trial Court Opinion, 7/21/15, at 6 (citations to record omitted). The testimony of DHS caseworker, Amy Flite, supports the court's finding. In addition, Mother acknowledged during direct examination that Father resides in her home. N.T., 4/21/15, at 85.

Based on the foregoing, the testimonial evidence overwhelmingly demonstrates that Mother has refused or failed to perform her parental duties far in excess of the statutory six-month minimum. Indeed, the record supports the court's finding that Mother has not achieved any of her FSP

goals. Trial Court Opinion, 7/21/15, at 4. In fact, the record reveals that Mother has failed to comply with the objectives and/or court orders involving visiting Child; attending Child's medical appointments; participating in drug testing and evaluations; participating in parenting classes; and obtaining appropriate housing. Mother's mere passive interest in Child since his placement in July of 2013, is not sufficient to preserve her parental rights. *See B.,N.M.*, *supra*. As such, we discern no abuse of discretion by the trial court in terminating Mother's parental rights pursuant to Section 2511(a)(1).

In her second issue, Mother argues that the evidence is insufficient to support the termination of her parental rights under Section 2511(b). Mother acknowledges the testimony of Mr. Davis, that Child will not suffer irreparable harm if her parental rights are terminated. Mother baldly asserts that Mr. Davis' opinion is based, in part, on the foster parents allowing Child to communicate with Mother. She argues that the court abused its discretion under Section 2511(b) because "the foster parents do not have to continue allowing . . . [C]hild to have contact with . . . [M]other[,] nor do we know that they intend to continue to permit such interaction." Mother's brief at 16. We disagree.

In considering the affection a child may have for his or her natural parents, this Court has stated the following:

> [C]oncluding a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound. If a child's feelings were the dispositive factor in the bonding analysis,

the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse, is able to sift through the emotional wreckage and completely disavow a parent. . . . Nor are we of the opinion that the biological connection between [the parent] and the children is sufficient in of itself, or when considered in connection with a child's feeling toward a parent, to establish a *de facto* beneficial bond exists. The psychological aspect of parenthood is more important in terms of the development of the child and its mental and emotional health than the coincidence of biological or natural parenthood.

*In re K.K.R.-S.*, 958 A.2d 529, 535 (Pa. Super. 2008) (internal citations and quotation marks omitted).

Indeed, our Supreme Court confirmed that, "the mere existence of a bond or attachment of a child to a parent will not necessarily result in the denial of a termination petition." *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). The Court further stated that, "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *Id.* at 268. Moreover, the Court directed that, in weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind." *Id.* at 269. The *T.S.M.* Court observed that, "[c]hildren are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id.*

Instantly, the trial court found that Child loves Mother and recognizes her as his Mother, but that "the bond between Mother and Child is not a

- 12 -

beneficial bond." Trial Court Opinion, 7/21/15, at 10. Further, the court found:

> The record established that the Child will not suffer any irreparable harm by terminating Mother's parental rights, and it is in the best interest of the Child to terminate Mother's parental rights. The Child has heightened mental health needs that [f]oster parents provide, such as ensuring that Child takes his medication and attends therapy. Additionally, foster parents provide for all the daily needs of the Child as food, ensuring Child [is] progress[ing] in school and [his] social environment. The Child lives with his sibling[] and they have a brotherly interaction. Accordingly, removing the Child from his foster parent home would seriously impact the Child. It is in the best interest of the Child to remain with his foster parents. There is a parent/child bond between the Child and his foster parents.

*Id.* at 9-10 (citations to record omitted). The testimonial evidence supports the court's findings.

Mr. Davis testified on direct examination that Child, age eleven and in fourth grade at the time of the termination hearing, "has a difficult time managing his emotions and his behavior." N.T., 4/21/15, at 36. He testified that Child receives mental health services and is prescribed medication, which "help him to moderate [his behavior] and be more successful in the school and the home environment." *Id.*

Mr. Davis testified on cross-examination that Child loves Mother. *Id.* at 56. He acknowledged on inquiry by the trial court that Child is "very upset" when Mother misses her scheduled visits with him. *Id.* at 48-49. Mr. Davis testified that Child would miss seeing Mother if her parental rights are

terminated. *Id.* at 50. Nevertheless, Mr. Davis testified on redirect examination:

> Q. Is the bond between [Child] and his mom a beneficial bond that would help [Child] on a daily basis?
>
> A. [N]o, I would not say on a daily basis, no.

*Id.* at 55.

Importantly, with respect to a bond between Child and his foster parents, Mr. Davis testified:

> Q. [W]hat do you understand is the relationship like between [Child] and his foster parent in terms of bond?
>
> . . .
>
> A. The foster parent is . . . meeting his daily needs, making sure that he has the things that he needs. He is trying to ensure that he is progressing in school, in his social environments. And there's actually two foster parents, and this is with both foster parents.
>
>    And [Child] expresses concern for foster parents, desire to be with foster parents, desire to participate in activities with foster parents. That's what I would consider a bond.
>
> Q. Does [Child] love [foster parents]?
>
> A. I would say yes.

*Id.* at 53-54. In addition, Mr. Davis testified that Child resides in the foster home with his brother. *Id.* at 40. He continued on direct examination:

> Q. Do you believe it would be irreparable to [Child] if he was removed from the home with his brother?
>
> A. I believe that it would impact him.

Q. Do you believe it's in [Child]'s best interest to remain in the foster home?

A. At this time, I would say yes.

. . .

Q. Do you believe [Child] is in need of a stable environment?

A. Yes.

Q. And where do you believe that [Child] gets a stable environment?

A. With his foster parents now.

*Id.* at 40-41.

Based on the foregoing testimony and the totality of the record evidence, we conclude that terminating Mother's parental rights will serve the developmental, physical, and emotional needs and welfare of Child. In addition, we reject Mother's assertion that Mr. Davis' opinion, that no beneficial relationship exists between Child and Mother, is based on the foster parents allowing Child to communicate with Mother. Rather, our review of Mr. Davis' testimony reveals that his opinion is based on the foster parents providing Child with his daily needs, and that Child is bonded with them. Therefore, we discern no abuse of discretion by the court in

terminating Mother's parental rights pursuant to Section 2511(b). Accordingly, we affirm the decree.[6]

Decree affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/18/2016

---

[6] The Child Advocate has filed an appellee brief in support of the involuntary termination decree pursuant to 23 Pa.C.S.A. § 2511(a) and (b).